Frank S. Hedin (SBN: 291289)
**HEDIN HALL L.L.P.**
Four Embarcadero Center, Suite 1400
San Francisco, California 94111
(415) 766-3534
fhedin@hedinhall.com

Scott R. Drury (*Pro Hac Vice Application Forthcoming*)
Illinois Bar No. 6255867
**DRURY LEGAL, LLC**
6 Carriage Lane
Highwood, Illinois 60040
(312) 358-8225
scott@drurylegal.com

*Attorneys for Plaintiff and the proposed class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SARAH MCKAY, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NUGS.NET ENTERPRISES, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sarah McKay ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through her attorneys, makes the following allegations against Defendant Nugs.net Enterprises, Inc. ("Defendant") pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    Defendant is a "multi-channel band-to-fan distribution network that enables over 1,000 artists, festivals, venues, and record labels to monetize live performances via branded download sites; [its] own direct-to-consumer site, nugs.net; pay-per view broadcasts and web-streaming; on-demand CD production; and digital-only subscription services."[1]

2.    This is a class action brought on behalf of a class of all persons in the United States who, during the class period (defined below), were subscribers and/or purchasers of goods or services from Defendant's streaming service nugs.net ("Nugs.net") (the defined class hereinafter referred to as the "Class").

3.    Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendant's violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, by knowingly disclosing to Facebook, Inc.[2] without the requisite consent information that would readily permit an ordinary person to identify Plaintiff's and Class members' video-watching behavior, including videos they requested and/or obtained.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States, namely the VPPA.

5.    The Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class exceeds $5 million, and at least one member of the Class is a citizen of a state different from that of Defendant.

---

[1] https://api.nugs.net/for-artists (last accessed on Apr. 19, 2023).

[2] In October 2021, Facebook, Inc. changed its name to Meta Platforms, Inc. Unless otherwise indicated, Facebook, Inc. and Meta Platforms, Inc. are referenced collectively as "Facebook."

6. The Court has personal jurisdiction over Defendant because Defendant's principal place of business is in San Francisco, California.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District; and (b) Defendant does business in this District and is subject to personal jurisdiction herein.

### THE PARTIES

*Plaintiff*

8. Plaintiff Sarah McKay is an adult citizen of the state of California and is domiciled in Redway, California.

9. Plaintiff is a Nugs.net subscriber. Plaintiff first subscribed to Nugs.net in 2022 and, at varying times, has had either a paid or free subscription. Plaintiff has used Nugs.net to watch prerecorded and livestream videos of musical performances offered on Nugs.net, including performances by Billy Strings. Plaintiff has requested, obtained and watched video materials and requested and obtained video services from Nugs.net using the website www.nugs.net (the "Website") and a related app offered by Defendant (the "App").

10. Plaintiff has had an active Facebook account since approximately 2009.

*Defendant*

11. Defendant Nugs.net Enterprises, Inc. is a Delaware corporation with its principal place of business located in San Francisco, California. Defendant is engaged in the business of, among other things, delivery of: (a) "prerecorded video cassette tapes or similar audio visual materials," *see* 18 U.S.C. § 2710(a)(4) – namely, on-demand videos delivered via the Website and the App; and (b) livestream videos delivered via the Website and the App. Defendant provides its services throughout the United States, including in this District.

//

//

//

//

# FACTUAL ALLEGATIONS

***The Video Privacy Protection Act***

12.     As alleged in more detail below, the VPPA is designed to prohibit the invasion of privacy that necessarily accompanies the disclosure to others of audio-visual materials that consumers request or obtain from "video tape service providers."

13.     In relevant part, the VPPA defines a "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials . . . ." 18 U.S.C. § 2710(a)(4).

14.     Pursuant to the VPPA, a "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person . . . ." 18 U.S.C. § 2710(b)(1).

15.     The VPPA defines a "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

16.     Under the VPPA, "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(1)(3).

17.     According to Senator Patrick Leahy who introduced the VPPA in 1988:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. * * * [I]n an area of interactive television cables, the growth of computer checking [sic] and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. * * * I think that is wrong. I think that really is Big Brother, and I think it is something we have to guard against.

> *        *        *

> [Privacy] is not a conservative or liberal or moderate issue. It is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone.[3]

---

[3] S. Rep. 100-599 at 5-6 (1988) (internal ellipses and brackets in original).

18.    Ultimately, Senator Leahy referred to the "trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems" as a "new more subtle and pervasive form of surveillance."[4]

19.    Relatedly, when the VPPA passed in 1988, Congress foresaw the danger computer technology imposes on individuals' privacy, as evidenced by remarks made by Senator Paul Simon:

> There is no denying that the computer age has revolutionized our world.
>
> *    *    *
>
> Yet, as we continue to move ahead, we must protect time honored values that are so central to this society, particularly our right to privacy. The advent of the computer means not only that we can be more efficient than ever before, but that we have the ability to be more intrusive than ever before. Every day Americans are forced to provide to businesses and others personal information without having control over where that information goes. * * * These records are like a window into our loves, likes, and dislikes.[5]

20.    Under the VPPA, any person aggrieved by a violation of the VPPA may bring a civil action and may be awarded "actual damages but not less than liquidated damages in an amount of $2,500," as well as punitive damages, reasonable attorneys' fees and other litigation costs reasonably incurred. 18 U.S.C. § 2710(c). The VPPA also allows for other preliminary and equitable relief determined to be appropriate. *Id.*

21.    While the VPPA allows a video tape service provider to disclose "personally identifiable information," as it defines that term, concerning a consumer with the "informed, written consent . . . of the consumer," such "informed, written consent" must be "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(B). Moreover, (a) at the consumer's election the "informed, written consent" must be given "at the time the disclosure is sought" or "in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner; and (b) the video tape service provider must provide the consumer with an opportunity "in a clear and conspicuous manner . . . to withdraw on a case-by-case basis or to withdraw from ongoing disclosures . . . ." *Id.*

---

[4] *Id.* at 7.
[5] *Id.* at 6-7 (internal ellipses within paragraph in original).

*Facebook*

### *Facebook User IDs*

22.     Among other things, Facebook offers a "family of apps," including the Facebook app (the "Facebook App").[6]

23.     Facebook describes itself as a "real identity platform,"[7] meaning users are required to use "the name they go by in everyday life."[8] To sign up for a Facebook App account, users must provide their first and last names, along with their birthday and gender.[9]

24.     Facebook assigns each Facebook App user a unique and persistent identifier referred to as a Facebook User ID ("Facebook ID").

25.     Through the Facebook ID alone, Facebook can easily identify the specific individual associated with a specific Facebook ID.

26.     Similarly, any person in possession of a Facebook App user's Facebook ID can use that Facebook ID to connect to that specific user's Facebook App public profile and view any publicly-available personal information contained in that profile, including the user's name.

### *Facebook's Business Model and Business Tools*

27.     With respect to Facebook's family of apps, Facebook generates "substantially all of its revenue from selling advertising placements to marketers."[10]

28.     According to Facebook, "[a]ds on our platforms enable marketers to reach people based on a variety of factors including age, gender, location, interests, and behaviors."[11]

---

[6] FACEBOOK, META ANNUAL REPORT 2021 ("FACEBOOK ANNUAL REPORT") at 7, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2023/2021-Annual-Report.pdf (last accessed on Apr. 19, 2023).

[7] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701 (last accessed on Apr. 19, 2023).

[8] FACEBOOK, ACCOUNT INTEGRITY AND AUTHENTIC IDENTITY, https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/ (last accessed on Apr. 19, 2023).

[9] FACEBOOK, SIGN UP, https://www.facebook.com/reg/ (last accessed on Apr. 19, 2023).

[10] FACEBOOK ANNUAL REPORT at 7.

[11] *Id.*

29.     To this end, Facebook allows advertisers to build Custom Audiences,"[12] a feature that allows advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[13]

30.     The Custom Audiences feature not only allows an advertiser to target existing customers, it also allows advertisers to target what Facebook calls a "Lookalike Audience" which consists of people who share similar traits and habits as an advertiser's Custom Audience.[14]

31.     One way advertisers can build Custom and Lookalike audiences is by using Facebook "Business Tools."[15]

32.     Facebook's Business Tools help advertisers "integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[16]

### *The Facebook Tracking Pixel*

33.     One Business Tool offered by Facebook is the Facebook Tracking Pixel.

34.     According to Facebook, the Facebook Tracking Pixel "is a small snippet of code" that advertisers can integrate into their website code.[17]

---

[12] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last accessed on Apr. 19, 2023).

[13] FACEBOOK, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting (last accessed on Apr. 19, 2023).

[14] *See* FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last accessed on Apr. 19, 2023).

[15] *See* FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087 (last accessed on Apr. 19, 2023); *see also* FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed on Apr. 19, 2023).

[16] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087 (last accessed on Apr. 19, 2023).

[17] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting (last accessed on Apr. 19, 2023).

35.     Once integrated, the Facebook Tracking Pixel "tracks the people and type of actions they take when they engage with [a company's] brand, including . . . the pages of [the company's] site they visit and the items they add to their carts."[18]

36.     When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script, written in JavaScript, surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers. This secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Facebook Tracking Pixel is configured to collect. This transmission is initiated by the Facebook code installed on the host website and concurrent with the communications with the host website. Thus, at relevant times, two sets of code are automatically run as part of the user's browser's attempt to load and read the website – Defendant's own code and the embedded Facebook code.

37.     After intercepting the information described in the preceding paragraph in the manner described therein, Facebook processes, analyzes and assimilates it into datasets like Core Audiences and Custom Audiences, thereby allowing entities like Defendant to better target and build their customer base.

38.     Entities such as Defendant that embed the Facebook Tracking Pixel on their websites control how the Facebook Tracking Pixel is implemented to distribute information to Facebook regarding people who visit the websites.[19]

39.     Among other things, the Facebook Tracking Pixel transmits cookies to Facebook.[20]

40.     Cookies enable Facebook "to understand the information that we receive about you, including information about your use of other websites and apps, *whether or not you are registered or logged in*" – *i.e.*, Facebook identifies and tracks website visitors regardless of whether they have Facebook App accounts.[21]

---

[18] *Id.*

[19] *See* FACEBOOK, META PIXEL, https://developers.facebook.com/docs/meta-pixel (last accessed on Apr. 19, 2023).

[20] *See* FACEBOOK, PRIVACY CENTER: COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies (last accessed on Apr. 19, 2023).

[21] *Id.* (emphasis added).

41.     Among the cookies used by the Facebook Tracking Pixel are the c_user and fr cookies.

42.     The c_user cookie collects and transmits to Facebook the unencrypted Facebook IDs of website visitors who are logged into their Facebook App accounts.

43.     The fr cookie minimally collects and transmits to Facebook a website visitor's browser information, and if the visitor is logged out of their Facebook App account, an encrypted version of the visitor's Facebook ID.[22]

44.     Facebook uses the c_user and fr cookies to, *inter alia*, link website visitors with the: (a) visitors' Facebook IDs and public profiles on the Facebook App; and (b) profiles Facebook has amassed about the visitors.

45.     The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[23]  Otherwise, the c_user cookie is cleared when the browser exits.[24]

46.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[25]  If that happens, the time resets, and another 90 days begins to accrue.[26]

47.     Another feature entities such as Defendant can use in conjunction with the Facebook Tracking Pixel to collect even more information about their website visitors is called "Advanced Matching."[27]

---

[22] *See* DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf at 33-34 (last accessed on Apr. 19, 2023); *see also* Facebook, Privacy Center: Cookies Policy – Advertising, recommendations, insights and measurement, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 (last accessed on Apr. 19, 2023).

[23] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a (last access on Apr. 19, 2023).

[24] *Id.*

[25] *See id.*

[26] Confirmable through developer tools.

[27] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142 (last accessed on Apr. 19, 2023).

48.     According to Facebook, "Advanced Matching can help you optimize your Facebook ads to drive better results," including increasing the size of an advertiser's Custom Audience by better matching "website visitors to people on [Facebook]."[28]

49.     Through a feature called "Automatic Advanced Matching," the Facebook Tracking Pixel is directed to "look for recognizable form fields and other sources on your website that contain information such as first name, last name and email address."[29]

50.     When form fields are found, Facebook then uses the information "to more accurately determine which people took action in response to your ad."[30]

***Defendant's Website***

51.     Defendant developed, owns and operates the Website, as well as the App which is available on iPhone and Android devices.

52.     The Website is accessible from desktop and mobile devices.

53.     Through the Website, Defendant offers prerecorded video-on-demand, as well as livestream, streaming videos of musical performances by numerous bands and artists.

54.     A Nugs.net subscriber seeking to livestream a performance must purchase access to the video livestream, which also provides the subscriber with the ability to watch a recording of the livestream at a later date as a video-on-demand video.

55.     Defendant offers both free and paid subscriptions to Nugs.net, which can be accessed through the Website and App.

//

//

//

//

//

---

[28] *Id.*

[29] *Id.*

[30] *Id.*

1    56.    As shown in Figure 1, below, to sign up for a free subscription, Defendant requires a

2    prospective subscriber to fill out a form field seeking the prospective subscriber's first name, email

3    address and password, or to sign up via a third-party:



**Figure 1 – Nugs.net free subscription page**

21    57.    Neither when signing up for a free subscription, nor at other times, is a prospective or

22    actual subscriber required to read, agree to or acknowledge Defendant's terms or conditions or

23    privacy policy in order to establish a Nugs.net account. *See* Figure 1.

24    58.    To sign up for a paid subscription, a subscriber is required to fill out another form

25    field that requires the subscriber to provide "payment details," as shown in Figure 2, below:



**Figure 2 – Nugs.net paid subscription page**

59.    Once subscribed, a subscriber with a free or paid subscription account must fill out a form field each time they log into their account or login via a third party, as shown in Figure 3, below:

//
//
//
//
//
//
//
//
//

1

2

3

4

5

6

7

8

9

10

11

12

13

14



**Figure 3 – Nugs.net sign-in page**

15    60.    With a free subscription, a subscriber can purchase access to video livestreams and

16  concert audio files, among other things. As alleged above, a subscriber who purchases access to a

17  video livestream later has on-demand access to a recording of the purchased video livestream for a

18  specified period of time.

19    61.    With a paid subscription, a subscriber can access, among other things, prerecorded

20  on-demand streaming video and audio content from a massive digital library. A paid subscriber can

21  also purchase and view video livestreams and purchase downloadable audio files in the same manner

22  as an unpaid subscriber.

23    62.    A monthly Nugs.net paid subscription costs either $12.99 per month or $24.99 per

24  month, depending on the sound quality desired by the subscriber.

25    63.    An annual Nugs.net paid subscription costs either $129.99 or $249.99, depending on

26  the sound quality desired by the subscriber.

27

28

*Defendant's Integration of Facebook Tracking Pixels and*
*Use of Automatic Advanced Matching*

64.    As part of its development and operation of the Website, Defendant knowingly integrated into the Website various code, including source code, script, object code, software, computer programs and other statements or instructions.

65.    Amongst the code Defendant knowingly integrated into the Website was code for the Facebook Tracking Pixel.

66.    As shown in Figures 4 and 5, below, Defendant integrated two separate Facebook Tracking Pixels into the Website: (a) one bearing unique Pixel ID No. 584020173505835 ("Tracking Pixel No. 1"); and (b) one bearing unique Pixel ID No. 1470889556551552 ("Tracking Pixel No. 2") (Tracking Pixel Nos. 1 and 2, collectively, the "Integrated Tracking Pixels"):



**Figure 4 – Tracking Pixel No. 1**



**Figure 5 – Tracking Pixel No. 2**

67.    Defendant integrated the Integrated Tracking Pixels for the purpose of disclosing to Facebook its subscribers' "personally identifiable information," as defined in the VPPA, along with its subscribers' video-watching behavior, among other information (collectively, "Personally

Identifiable Information"), thereby allowing Defendant to gain insight into that behavior, improve its products, provide targeted marketing and advertising and offer new products, programs and services, among other things.

68.    In promoting the value of the Website to potential clients – *i.e.*, artists, festivals, venues and record labels – Defendant boasted and continues to boast that it "markets our clients' content online . . . including [through] *targeted Facebook ad campaigns*."[31]

69.    Defendant's ability to effectively target ads enables Defendant to sign-up more clients, which in turn leads to more subscribers and more revenue for Defendant.

70.    To enhance the robustness of the Integrated Tracking Pixels, Defendant enabled Automatic Advanced Matching.

71.    As a result of Defendant's use of Automatic Advanced Matching, when a subscriber fills out a form field on the Website, Defendant discloses that information to Facebook to "drive better [ad] results."[32]

***The Functionality of the Integrated Tracking Pixels on Defendant's Website***

72.    Defendant integrated Tracking Pixel No. 1 into various pages within the Website where subscribers with paid and unpaid subscriptions can, *inter alia*, purchase access to livestream videos (which could later be watched as recordings) and downloadable audio files.

73.    In contrast, Defendant integrated Tracking Pixel No. 2 into pages within the Website where paid subscribers can request, obtain and watch on-demand videos and stream audio files, among other things.

74.    As shown in Figures 6 and 7, below, when a free subscriber requests and obtains a livestream video from Nugs.net, Defendant disclosed, and continues to disclose, to Facebook via Tracking Pixel No. 1: (a) the specific video requested or obtained – *i.e.*, "live-download-of-billy-strings-1st-bank-center-broomfield-co-02-02-2023-mp3-flac-or-online-music-streaming"    (*see*

---

[31] https://api.nugs.net/for-artists (under "Marketing" arrow) (emphasis added) (last accessed on Apr. 19, 2023).

[32] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142 (last accessed on Apr. 19, 2023).

Figures 6 and 7); and (b) the specific person who made the request, in the form of a Facebook ID, transmitted via the "c_user" cookie – *i.e.*, "c_user=[Facebook ID]." Defendant also disclosed, and continues to disclose, the URL where the video is located.



**Figure 6**
**Screenshot showing information disclosed to Facebook**
**when a subscriber requests and obtains a livestream video**

// 

// 

// 

// 

// 

// 

// 

// 

// 

// 

//



**Figure 7**
**Closeup of information disclosed to Facebook when a subscriber**
**requests and obtains a livestream video**

75.     Similarly, as shown in Figures 8 and 9, below, when a paid subscriber requests and obtains a prerecorded video from Nugs.net, Defendant disclosed, and continues to disclose, to Facebook via Tracking Pixel No. 2: (a) the specific video requested or obtained – *i.e.*, "Peter%20/Frampton/container/28172" (*see* Figures 8 and 9); and (b) the person who made the request, in the form of a Facebook ID, transmitted via the "c_user" cookie – *i.e.*, "c_user=[Facebook ID]." Defendant also disclosed, and continues to disclose, the URL where the video is located.

//

//

//

//

//

//

//



**Figure 8**
**Screenshot showing information disclosed to Facebook**
**when a paid subscribed requests and obtains an on-demand video**



**Figure 9**
**Closeup of information disclosed to Facebook when a**
**paid subscriber requests and obtains an on-demand video**

76.    Defendant knowingly disclosed, and continues to disclose to Facebook, the Personally Identifiable Information and related information described herein, including the Personally Identifiable Information and related information of Plaintiff, in a single, consolidated data transmission identifying the person who requested or obtained the video materials and services and the specific video materials and services requested and obtained.

77.    At relevant times, the Personally Identifiable Information and related information disclosed by Defendant readily permitted, and continues to permit, Facebook and any ordinary person to identify a specific individual's video-watching behavior, including the specific video-watching behavior of Plaintiff.

**Defendant's Failure to Seek or Obtain the Requisite Consent**

78.    Plaintiff did not consent, agree, authorize or otherwise permit Defendant to disclose to Facebook her Personally Identifiable Information or related information she provided to Defendant through the Website or App. Defendant did not provide Plaintiff with any written notice that Defendant disclosed such information to Facebook through integration of the Integrated Tracking Pixels, nor did Defendant provide Plaintiff with any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed Plaintiff's Personally Identifiable Information and related information to Facebook through its integration of the Integrated Tracking Pixels.

79.    Moreover, at no time did Defendant seek or obtain "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," *see* 18 U.S.C. § 2710(b)(2)(B), Plaintiff's informed written consent to disclose her Personally Identifiable Information. Nor did Defendant provide Plaintiff with an opportunity "in a clear and conspicuous manner . . . to withdraw on a case-by-case basis or to withdraw from ongoing disclosures" of her Personally Identifiable Information. *See id.*

80.    Plaintiff did not discover that Defendant disclosed her Personally Identifiable Information and related information to Facebook until approximately March 2023.

## **CLASS ACTION ALLEGATIONS**

81.    Class Definition:  Plaintiff brings this action on behalf of herself and a class of all persons in the United States who, during the class period (defined below), were subscribers and/or purchasers of goods or services from Nugs.net.

82.    Plaintiff reserves the right to modify the Class definition or to add subclasses as necessary prior to, or in connection with, the filing a motion for class certification.

83.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

84.    Excluded from the Class is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; counsel or anyone employed by counsel in this action; any judge to whom this case is assigned, as well as his or her spouse and immediate family members; and members of the judge's staff.

85.    Numerosity/Ascertainability.  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class members is unknown to Plaintiff at this time; however, it is estimated that there are, at least, thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party Facebook's records.

86.    Typicality.  Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all members of the Class, subscribed to and used Nugs.net, requested and obtained videos thereon, and had her Personally Identifiable Information and related information disclosed to Facebook by Defendant without Defendant obtaining the requisite consent. Further, Plaintiff's claims are based on the same legal theories as the claims of other Class members.

87.    Adequacy.  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.  Plaintiff is represented by counsel with experience

in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically. Plaintiff's counsel is committed to vigorously prosecuting this action on behalf of the members of the Class.

88.    <u>Common Questions of Law and Fact Predominate.</u>    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Class include:

(a)    Whether Defendant collected the Personally Identifiable Information and related information of Plaintiff and members of the Class;

(b)    Whether Defendant unlawfully disclosed and continues to unlawfully disclose to Facebook the Personally Identifiable Information and related information of Plaintiff and members of the Class;

(c)    Whether Defendant's disclosures of Personally Identifiable Information and related information constitute an affirmative act of communication;

(d)    Whether Defendant's unlawful disclosures were committed knowingly;

(e)    Whether Defendant violated the privacy rights of Plaintiff and members of the Class by using the Facebook Tracking Pixel to record and disclose the Personally Identifiable Information and related information of Plaintiff and members of the Class; and

(f)    Whether Plaintiff and members of the Class are entitled to damages under the VPPA.

89.    <u>Superiority.</u>    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued

individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIM FOR RELIEF

### COUNT ONE
**Violation of the Video Privacy Protection Act**
**18 U.S.C. § 2710, *et seq.***
**(On behalf of Plaintiff and members of the Class)**

109.    Plaintiff repeats the allegations contained in paragraphs 1 through 89, above, as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

110.    Defendant is a "video tape service provider" because it is "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

111.    Plaintiff and members of the Class are "consumers" because: (a) they paid money on a recurring basis to subscribe to Nugs.net; and/or (b) they signed up to be Nug.net members and, in connection therewith, have to sign in to Nugs.net with a login name and password.

112.    Defendant disclosed to a third party, Facebook, Plaintiff and Class members' Personally Identifiable Information, including personally identifiable information as defined by the VPPA. Defendant utilized Facebook's Business Tools to compel the web browsers of Plaintiff and Class members to transfer identifying information of Plaintiff and Class members, such as their Facebook IDs, along with their video viewing behavior, such as the specific videos they requested and/or obtained.

113.    Plaintiff and members of the Class viewed videos using Defendant's Website and App.

114.    Defendant knowingly disclosed the Personally Identifiable Information, including personally identifiable information as defined by the VPPA, of Plaintiff and Class members because it used that data to build audiences on Facebook and retarget them for its advertising campaigns.

115.    Plaintiff and Class members did not provide Defendant with any form of consent – written or otherwise – to disclose their Personally Identifiable Information, including personally identifiable information as defined by the VPPA, to third parties.

116.    Defendant's disclosures were not made in the "ordinary course of business" as that term is defined in the VPPA – namely, the disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] the transfer of ownership." 18 U.S.C. § 2710(a)(2).

117.    As a result of the above violations, Defendant is liable to Plaintiff and Class members for liquidated damages in the amount of $2,500 for each violation of the VPPA, *see* 18 U.S.C. § 2710(c). Plaintiff and Class members also seek their reasonable attorneys' fees and other litigation costs reasonably incurred, punitive damages and equitable relief as is necessary to protect the interests of Plaintiff and Class members by requiring Defendant to comply with the VPPA's requirements for protecting a consumer's personally identifiable information.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

    a.   For a determination that this action is a proper class action;

    b.   For an order certifying the Class, naming Plaintiff as representative of the Class and naming Plaintiff's counsel as Class Counsel to represent the Class;

    c.   For an order declaring that Defendant's conduct violates the VPPA;

    d.   For an order finding in favor of Plaintiff and the Class on the claim set forth herein;

    e.   For an award of compensatory damages, including statutory or liquidated damages where available, to Plaintiff and members of the Class against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

    f.   For punitive damages, as warranted, in an amount to be determined at trial;

g. For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h. For prejudgment interest on all amounts awarded;

i. For injunctive relief as pleaded or as the Court may deem proper;

j. For an order awarding Plaintiff and Class members their reasonable attorneys' fees and reasonable expenses and costs of suit; and

k. For an order granting Plaintiff and Class members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the proposed Class, demands a trial by jury for all of the claims asserted in this Complaint so triable.


Dated: April 20, 2023                     Respectfully submitted,

                                          **HEDIN HALL L.L.P.**

                              By:    /s/ Frank S. Hedin
                                     FRANK S. HEDIN

                                     **HEDIN HALL L.L.P.**
                                     Frank S. Hedin (SBN: 291289)
                                     Four Embarcadero Center, Suite 1400
                                     San Francisco, California 94111
                                     (415) 766-3534
                                     fhedin@hedinhall.com

                                     **DRURY LEGAL, LLC**
                                     Scott R. Drury*
                                     6 Carriage Lane
                                     Highwood, Illinois 60040
                                     Telephone: (312) 358-8225
                                     E-Mail: scott@drurylegal.com

                                     *Pro Hac Vice Application Forthcoming*

                                     *Attorneys for Plaintiff and the Putative Class*